=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 109
The People &c.,
          Respondent,
        v.
Howard S. Wright,
          Appellant.

          David M. Kaplan, for appellant.
          Geoffrey Kaeuper, for respondent.

RIVERA, J.:

          We are presented in this appeal with a confluence of

prosecutorial misconduct committed during closing argument, and a

series of critical lapses by defense counsel when faced with the

prosecutor's obvious transgressions from the leeway generally

afforded attorneys during summation.  As the record establishes,

- 1 -

defense counsel failed to object, time and again, when the prosecutor repeatedly misrepresented to the jury critical DNA evidence as proof of defendant's guilt, in contradiction of the People's expert testimony.  We conclude defense counsel was ineffective, and, on the record before us, defendant was denied a fair trial as a result.  Therefore, the order of the Appellate Division should be reversed.

I.

Defendant Howard Wright was tried and convicted of murder in the second degree.  The People's case was circumstantial because there were no eyewitnesses to the crime and no forensic evidence that clearly established defendant's guilt.  Other than testimony that placed defendant and others in the victim's company around the time of her death, and defendant's statement that he engaged in consensual sex with the victim, the People had no evidence that linked her to defendant.  To meet the People's burden of proof, the prosecutor relied heavily on the results of DNA testing to connect defendant to the murder.  However, the DNA analysis was also circumstantial because it did not "match" defendant's DNA to the DNA collected at the crime scene.  Instead, the test only indicated that defendant could not be excluded from the pool of male DNA contributors, and the expert testimony provided no statistical comparison to measure the significance of those results.

Notwithstanding the known limitations of this DNA evidence and the indeterminate conclusions about the test results drawn by the People's own experts, the prosecutor in summation misrepresented the DNA analysis, including arguing the evidence established that defendant's DNA was at the crime scene and on a critical piece of evidence linked to the victim's murder. In light of the powerful influence of DNA evidence on juries, the opportunity for juror confusion regarding the limited probative value of the DNA methodology employed in this case, and the qualified nature of the test results, defense counsel's failure to object rendered him ineffective.

To understand the nature of the prosecutor's actions and the lack of any reasonable strategy for leaving the prosecutor's statements unchallenged, we begin our consideration of defendant's appeal with a review of the relevant trial evidence and the prosecutor's closing argument. Our legal analysis then focuses on the details of the summation and defense counsel's unexplained silence.

## II.

### A. Testimony Connecting Defendant to the Victim

Defendant was tried in 2007 for the murder of the victim, a female drug user, who was found dead on a Rochester street on November 29, 1995. Defendant had been seen in the victim's company, in the hours before her murder, in the vicinity of a building associated with drug use.

According to a witness who knew defendant and had seen the victim "around" on prior occasions, she observed the victim in a car with three men, whom she identified as defendant, Christopher Gifford, and Keith Evans, between 8:00 and 9:00 p.m. on November 28, 1995. She saw the car pull up to a building on North Clinton Avenue and drive away after Evans exited the car. She then saw defendant and Gifford the following morning, between 5:00 and 6:00 a.m., as they exited through the back of the same building. This time she did not see the victim. Shortly after defendant walked out, she saw the victim's car pull out from the back of the building and drive past. Although she testified she did not see who was in the car, she assumed that it was defendant and Gifford because they were the only persons who exited through the back of the building to where she had observed the car was parked.

Evans testified and confirmed that he had been with the victim and defendant around the time of the murder. Evans, a drug dealer at the time, was a regular associate of defendant, and also knew the victim. He testified that, on November 28, he went to a building on Chamberlain Avenue, to sell cocaine. He found the victim with her baby, defendant, Gifford, and two other individuals, identified as brothers Freddy and Christopher Walker, in one of the apartments. He claimed that defendant and Gifford had sold drugs to the victim that day. At some point the victim left in her car and, between 4:00 and 5:00 p.m., returned

without the baby.  She again left the apartment, this time with Freddy, returning 45 to 60 minutes later.  Between 5:00 and 7:30 p.m., the victim drove Evans, defendant, and Gifford to a tavern, where she and Evans spent approximately 15 minutes inside the tavern before she drove to the North Clinton Avenue building and dropped off Evans, somewhere between 7:30 and 8:00 p.m.  She then drove off with defendant and Gifford.

Evans further testified that, over the course of the next several hours, he saw defendant and Gifford together, but without the victim.  Evans claimed that between 11:00 and 11:45 p.m. he was outside on the street near the North Clinton Avenue building, on his way to make a telephone call to the police on an unrelated matter, when he saw defendant and Gifford walking by.[1] Evans also testified that he saw the victim's car in the alley next to the building where he had just seen defendant and Gifford.

Around 2:00 a.m., on November 29, he saw defendant and Gifford drive past in the car.  Evans next saw defendant and Gifford a few hours later, between 4:00 and 5:00 a.m., when he went inside one of the apartments in the North Clinton Avenue building looking for them believing they had taken his food.  He found them sleeping in the apartment, and, after he woke them up, they exited the building and drove away in the victim's car.

---

[1]The fact of the call, but not the time, was confirmed by a police officer who testified that he received a dispatch at 12:40 a.m. and spoke with Evans a few minutes later.

Evans testified that he saw defendant a few days after he saw a newspaper reference to the victim.  As they walked on the street defendant pointed out the victim's car, which was parked where the police subsequently found it.  When Evans asked defendant about the victim, defendant told Evans that he and Gifford engaged in sex with her.  Afterwards, defendant and Gifford dropped her off, and then Gifford dropped off defendant.  Later Gifford told defendant where he left the victim's car.  Evans described the location where the victim was dropped off as where "people that were doing the same thing they were doing."  On cross-examination, Evans suggested that she had been left with others who were "strung out on drugs."

B.  Discovery and Examination of the Victim's Body and Car

At approximately 9:00 a.m. on November 29, 1995, the victim was found lying in the driveway of a house, clothed but barefoot, with her hands bound by a shoelace behind her back, and with a shoelace tied around her neck as a ligature.  A sock was found inside her clothing near her buttocks.

The police found the victim's car on November 30, 1995, near North Clinton Avenue, and discovered a pink sock inside, along with various baby items.  The victim's hairs were found in the car as well as hair samples from both white and black individuals.

The medical examiner testified that the victim died as

a result of asphyxia from ligature strangulation, with the approximate time of death between 11:30 p.m., on November 28, and 3:30 a.m the day she was discovered.  The body had abrasions under the chin and around the neck.  The medical examiner also found two dark-colored hairs near the victim's external genitalia, later identified not to be the victim's.

Various physical evidence, including the hand and neck shoelace ligatures, vaginal swabs taken from the victim, a sperm sample taken on her panties, the two hairs, and an additional hair from the victim's mouth, were sent to an independent laboratory for further analysis.  The results of the analysis were presented at trial through expert testimony.

C.  Forensic and DNA Evidence

The People presented testimony of three forensic experts to discuss the DNA evidence collected during the police investigation.  The evidence included samples from the crime scene and the victim, and buccal swabs from the victim's husband, defendant, Evans, Gifford, and Christopher and Fred Walker.

One expert from the Monroe County Public Safety Laboratory, explained DNA and DNA profiles, how DNA profiles are developed, and how DNA testing and analysis are used to compare an individual's DNA profile with the DNA profile of evidence obtained at a crime scene.  She explained that because less than one percent of human DNA is different, DNA analysis looks at

specific regions of DNA to identify where the DNA is different between individuals.  In order to make comparisons, the analyst studies the different locations on DNA profiles to determine if the individual is a possible donor to the DNA from the crime scene.  If there are differences on the locations, then the individual is excluded from the possible contributors to the DNA.

She testified that in 1995 when she was an Assistant Forensic Chemist for Monroe County, she examined swabs taken from the victim, which contained semen and sperm.  Then in 2006, in her position as a Forensic Biologist, she examined ligatures from the victim's hands and neck.  The DNA profile from the neck ligature only matched the victim. The DNA from the hand ligature was so low-level that she did not report that data.  Instead, she sent the swabs from the ligatures to a private laboratory for additional testing, specifically Y chromosome or YSTR DNA testing, and mitochondrial DNA testing.  She also sent hairs collected from the victim's body, DNA extracts from the vaginal swab and the victim's panties, and the DNA samples from the victim, her husband, Evans, and the Walker brothers.

On cross-examination, the expert testified that the DNA profiles from the hand and neck ligatures were mixtures of at least two contributors, but that the DNA was of such a low level, meaning that there was a small amount of DNA or that it was degraded, that she was unable to report back any comparisons. Given the quality of the DNA, she could not state whether there

were more than two contributors.  She further explained the term "transference" as the process by which DNA transfers from one object to another, or from one person to an object.

She explained that a "match" results when the profiles are the same at all the locations tested on the DNA, after comparing the DNA crime scene profiles to an individual's DNA profile.  In contrast, the term "not excluded" is applied to mixtures of DNA.  She clarified that when the result establishes that an individual is "not excluded" this means "the data is of such quality that it is not strong enough to say it matches a particular person, but yet the data is also such that you cannot say that it is not them in that [DNA]."

A second expert, the Assistant Lab Director and DNA Technical Manager for the Monroe County Public Safety Laboratory, testified that in 2002, and again in 2006, she performed a differential DNA extraction on the vaginal swab and semen stain from the victim's panties.  Differential extraction is a method by which DNA is drawn from the biological material, and DNA from sperm cells is separated from the DNA in non-sperm cells.  According to her test results, the sperm fraction on the vaginal swab contained a DNA mixture of at least two contributors, of which Gifford could not be excluded as a contributor, but the victim's husband, Evans, and the Walker brothers were excluded.

The test also indicated that the semen stain from the panties contained a DNA mixture of at least four contributors, of

which the victim, her husband, and Gifford could not be excluded, but Evans and the Walker brothers were excluded. She also testified that her examination of certain vaginal slides from the victim's autopsy indicated recent sexual contact. The expert provided no testimony regarding defendant because she did not analyze his DNA, but rather sent his sample to the independent laboratory for further DNA testing.

The third forensic expert was from the independent laboratory that conducted the YSTR DNA tests on the swabs and physical material sent from the Monroe County laboratory. She described YSTR DNA testing, explaining that it is used to isolate male DNA from male/female DNA mixtures. The expert testified that she compared the male DNA samples provided by Monroe County with the samples from the victim and her husband, defendant, Gifford, Evans, and the Walker brothers. The purpose of these tests was to show whether any of the men's DNA characteristics matched characteristics of the crime scene DNA. If there was a match, she could not exclude the male from the pool of contributors with the DNA characteristics identified through the YSTR DNA test. She explained that YSTR DNA testing is distinct from autosomal DNA testing, which permits a statistical determination that an individual's DNA matches the crime scene DNA, rather than a finding that someone cannot be excluded from the pool of possible contributors, who have some of the same DNA characteristics found on the victim DNA samples.

The expert testified that based on the results of the YSTR DNA analysis she could not exclude defendant and the victim's husband as contributors to the hand ligature sample; that the analysis of the vaginal swab could not exclude defendant or Gifford as contributors; and that the victim's husband, Gifford, and defendant could not be excluded as contributors to the sample taken from the panties. She also testified that the mitochondrial DNA testing of a black hair sample, recovered from the victim's genitalia, matched the mitochondrial sequence of the victim and Gifford.

On cross-examination, the expert admitted that there was no statistical calculation drawn from the YSTR DNA testing, as can be done with autosomal DNA analysis, the more commonly familiar DNA testing.[2] She explained there is simply no single profile in YSTR DNA testing, as there is in autosomal DNA analysis. Instead, YSTR DNA analyzes a mixture of more than one DNA profile. Asked specifically if she could quantify how many men other than the defendant, in the Rochester area or the trial courtroom, had the same combination of DNA characteristics indicated on the hand ligature, the expert said she could not. She testified that she could only provide information based on

---

[2]In autosomal DNA testing, a profile derived from nuclear DNA is compared to another nuclear DNA profile to produce "a statistical expression of the profile's rarity in certain human populations" (Justice Ming W. Chin, et al., Forensic DNA Evidence: Science and the Law, ch. 5 [2015]).

persons for whom she had samples.  Again, asked specifically by defense counsel, "can you tell us with a reasonable degree of scientific certainty that [defendant's] DNA is present on this hand ligature sample that you tested," she responded "No, I cannot.  All I can say is I can't exclude him."

D.  Closing Arguments

During summation both the defense and the prosecution presented their respective views of the witnesses' testimony, and what it revealed about the timeline leading up to, and following, the victim's death.  For her part, the prosecutor relied heavily on the DNA evidence, and argued that the DNA established that defendant raped and murdered the victim. She told the jury that the case could be decided based on "common sense and science." She said that defendant and Gifford "left their DNA all over the crime" then turned her focus to what she argued was the one constant of the DNA analysis: that defendant was the only matching contributor across several DNA samples.

In the course of summation, she described the DNA evidence as narrowing the number of contributors.  She stated that there were "two contributors and two contributors only, and the sperm fraction of the vaginal swab matched the YSTR/DNA profile of the defendant and . . . Gifford."  She also stated that there were "[t]wo contributors to the sperm found in [the victim's] vagina after she was tied up, the defendant and his

accomplice, [Gifford]."  She also stated that the DNA is a

mixture that cannot provide a statistical calculation, she stated

repeatedly that defendant "could not be excluded as a contributor

to the mixture."

In addition the prosecutor stated,

> "The ligature on the hands, every single
> number that they were able to determine, and
> they were able to detect partial profile
> matches, is that of Howard Wright and [the
> victim's husband]"

> . . . .

> "We have no reasonable explanation for Howard
> Wright's DNA on that ligature that bound her
> hands"

> . . . .

> "We have [defendant's] sperm in [the
> victim's] vagina. We have [defendant's] sperm
> on [the victim's] underwear, and we have
> [defendant's] DNA profile included on the
> ligature that bound her hands together, the
> same identical ligature that is around her
> neck and strangled her to death.

She argued that of the YSTR DNA profiles tested, defendant was

the singular match to one of the most incriminating pieces of

evidence, the ligature.  "[T]he only one that matches of the

people that she was with that night, the only one who matches the

DNA profile on the ligature is [defendant]."

E.  Defendant's Conviction and Appeal

The jury found defendant guilty of second degree

intentional murder (Penal Law § 125.25 [1]) and acquitted him of

felony murder (Penal Law § 125.25 [3]) and rape (Penal Law §
125.35).  The court sentenced defendant to a term of 25 years to
life.

In a 3-2 decision, the Appellate Division affirmed,
with the majority rejecting defendant's claims that the evidence
was legally insufficient and against the weight of the evidence.
The court also concluded that defendant was not denied meaningful
representation, and that his prosecutorial misconduct claim was
unpreserved (115 AD3d 1257).

The two dissenters would have exercised the court's
interest-of-justice jurisdiction to review defendant's claim of
prosecutorial misconduct committed during summation, and would
have reversed on that ground.  They further would have reversed
on ineffective assistance of counsel grounds because

> "counsel's failure to object to the
> prosecutor's baseless transformation of
> evidence that defendant was in a group or
> class of people that could have contributed
> to the subject DNA samples to evidence that
> defendant was the sole possible contributor
> to those samples was so egregious and
> prejudicial that defendant did not receive a
> fair trial"

(id. at 1262).  A justice of the Appellate Division granted leave
to appeal (22 NY3d 1204 [2014]).  We now reverse.


III.

Defendant claims that his defense counsel was
ineffective because of various alleged errors committed by his

attorney during the course of the trial.[3]  We agree with

defendant only as to some of the errors alleged.  On this record,

we conclude that defense counsel's serial failure to object to

the prosecution's inaccurate and misleading descriptions of the

DNA evidence during the People's closing constitutes a pattern of

inexcusable mistakes that cannot be attributed to a failed trial

strategy, and which denied defendant a fair trial.

Every defendant is constitutionally entitled to

effective assistance of counsel, meaning under our state

standards that "[s]o long as the evidence, the law, and the

circumstances of a particular case, viewed in totality and as of

the time of the representation, reveal that the attorney provided

meaningful representation, the constitutional requirement will

have been met" (People v Baldi, 54 NY2d 137, 147 [1981], citing

People v Droz, 39 NY2d 457 [1976]).  Where a defendant claims

that counsel's performance is deficient the defendant must

"'demonstrate the absence of strategic or other legitimate

explanations' for counsel's alleged shortcomings" (People v

Benevento, 91 NY2d 708, 712 [1998], citing People v Rivera, 71

NY2d 705, 709 [1988]; comparing People v Flores, 84 NY2d 184

[1994] with People v Bennett, 29 NY2d 462, 465 [1972]; People v

---

[3] Defendant claims specifically that trial counsel made a
prejudicial statement during his opening statement, did not
present an expert witness to testify about Y chromosome DNA
testing, and failed to object to prejudicial statements during
the People's opening statement and summation.

Droz, 39 NY2d at 463; People v Gonzalez, 47 NY2d 606, 611 [1979]).

The standard is challenging, but not insurmountable. Even where counsel's errors "individually may not constitute ineffective assistance, 'the cumulative effect of [defense] counsel's actions [can] deprive[] defendant of meaningful representation' " (People v Oathout, 21 NY3d 127, 132 [2013] [first modification original], citing People v Arnold, 85 AD3d 1330, 1334 [3d Dept 2011]).  The task of a reviewing court is to "consider[] the seriousness of the errors in their totality" (id. at 132).  Moreover, as we have recognized, "although the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" (Benevento, 91 NY2d at 714).

An ineffective assistance claim based on defense counsel's failure to challenge a prosecutor's summation presents a unique set of considerations given the nature of closing statements generally.  However, prosecutorial misconduct is not immune to attack by defense counsel merely because it occurs during the course of summation.  As the Court has recognized,

> "although counsel is to be afforded 'the
> widest latitude by way of comment,
> denunciation or appeal in advocating
> [counsel's] cause' (Williams v Brooklyn El.
> R. Co., 126 NY 96, 103 [1891]) summation is
> not an unbridled debate in which the

restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits"

(People v Ashwal, 39 NY2d 105, 109 [1976]).  Summation must remain within

"the four corners of the evidence and avoid irrelevant comments which have no bearing on any legitimate issue in the case.  Thus the District Attorney may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferable from the evidence"

(id., at 109-110 [internal cites omitted]).  Defense counsel's inaction in the face of prosecutorial misconduct made during closing argument is subject to the same "meaningful representation" standard applicable to other trial errors.  Under that standard, where defense counsel fails to object when faced with a pattern of prosecutorial misstatements far afield from acceptable argument, such as statements that misrepresent evidence central to the determination of guilt, and where there is no apparent strategic explanation for defense counsel's silence, defendant has been deprived of meaningful representation and the constitutional right to a fair trial.


IV.

Here, defense counsel failed to object when the prosecutor misrepresented the scientific import of the DNA evidence, suggested that the evidence directly linked defendant to the murder although it did not, and made statements that

contradicted the expert testimony about the limitations of YSTR DNA analysis. Given the significance of the DNA evidence, defense counsel's silence is inexplicable, and under the circumstances of this case, his inaction was error.

During summation the prosecutor returned to the theme she had promoted during her opening, that this case was about "common sense and science." While some amount of hyperbole is not unusual, she exceeded "the four corners of the evidence" when she stated that defendant and his accomplice "left their DNA all over the crime." In fact, the YSTR DNA analysis in this case did not result in a "match" between defendant's DNA and the DNA found at the scene. According to the People's own expert, the analysis only revealed that defendant "could not be excluded" from the pool of possible contributors to the DNA mixture of samples collected.[4]

Although the prosecutor acknowledged that the DNA was a mixture and that the hand ligature comparison was based on "partial profile matches" of YSTR DNA, the prosecutor

---

[4]The dissent contends that "it is irrelevant that the prosecutor referred to defendant's DNA being inside the victim or on her underwear" (dissenting op, at 8) because defendant conceded that he engaged in intercourse with the victim and therefore defense counsel had no basis to object. However, the prosecutor relied on the DNA evidence in support of her theory of the case that the sex was not consensual and that DNA from the panties and vaginal swab matched the DNA on the ligatures, meaning the victim was murdered by the rapists. Thus, defense counsel had good reason to object when the prosecutor misrepresented that the DNA evidence of sexual contact connected defendant to the murder.

aggressively argued the view that defendant's DNA conclusively matched that found at the crime scene and on the victim. However, the expert testified on direct and cross-examination to just the opposite, and described the significant limitations of the YSTR DNA testing conducted in this case. Significantly, the expert testified that she could not state positively the total number of DNA contributors to the hand ligature sample, no wide statistical comparisons were made to identify the potential number of men who would be included in the pool of possible contributors, and that the hand ligature sample contained limited information possibly due to degradation of the DNA.

Nevertheless, the prosecutor's comments negated the main shortcoming of YSTR DNA analysis -- that it can only reveal that an individual is not excluded from the pool of persons with the same DNA profile as that found at the scene. She argued that of the people who were with the victim around the time of her murder, only defendant matched the hand ligature DNA profile. However, this was in direct contravention of the expert testimony on cross-examination:

> Defense counsel: Now, can you tell us with a reasonable degree of scientific certainty that [defendant's] DNA is present on this hand ligature sample that you tested?
>
> Answer: No, I cannot. All I can say is I can't exclude him.

The prosecutor's attempt to establish defendant as the sole contributor also contradicted the expert's testimony on

cross-examination that it was possible that three individuals contributed to the DNA mixture on the hand ligature.  It also minimized and ignored the expert's testimony that the lab was able to obtain reportable results on only 4 of the 12 areas of the Y chromosome tested, which constituted a "partial profile," meaning the lab obtained a limited amount of information, and that it was possible that, before testing, the sample had degraded over time.  The prosecutor compounded these misrepresentations when she further asserted -- again in contravention of the expert testimony -- that there was "no reasonable explanation for [defendant's] DNA on that ligature."[5]

While the prosecutor was entitled to fair comment on the DNA evidence available in this case, she was not entitled to present the results in a manner that was contrary to the evidence and the science.  By interspersing references to DNA on the ligature with comments about defendant's DNA profile, the prosecutor mischaracterized the probativeness of the DNA evidence.

As the prosecutor acknowledged during her summation, and as the People concede on this appeal, the case against the defendant is circumstantial.  Apart from the forensic experts'

_____

[5]The prosecutor's own statements establish that she did not consider the DNA as merely "one piece of the puzzle" as the dissent suggests (dissenting op, at 9), but rather as the critical piece of evidence that could be used to persuade the jury of defendant's guilt.

testimony, the remaining trial evidence established only that defendant was one of at least two people seen with the victim before her death, and then in her car after the approximate time of the murder.  Defendant's statement that he engaged in sex with the victim was not proof of his role in her death, and the jury in fact acquitted the defendant of rape, apparently crediting the defense that the sex was consensual, and rejecting part of the prosecution's version of the events.  Thus, leaving only the DNA evidence to connect defendant to the murder.  Defense counsel, therefore, could not allow these misrepresentations to stand unchallenged.

Moreover, failing to object to the prosecutor's misstatements cannot be attributed to reasonable trial tactics because the summation undermined what, until that point, had been a rather effective defense strategy of identifying the weaknesses of the DNA evidence.  He secured an admission from the expert on cross-examination that she could not confirm defendant's DNA was on the hand ligature, and he solicited testimony that YSTR DNA analysis has several limitations, and that the DNA might have been degraded.  Defense counsel could not have reasonably chosen a strategy of allowing the prosecution to misrepresent the strength of the DNA evidence and equate the results of the testing with a finding that defendant was the sole match for the hand ligature DNA sample.

Indeed, the potential danger posed to defendant when

DNA evidence is presented as dispositive of guilt is by now
obvious.  As this Court previously recognized, "forensic DNA
testing has become an accurate and reliable means of analyzing
physical evidence collected at crime scenes and has played an
increasingly important role in conclusively connecting
individuals to crimes" (People v Pitts, 4 NY3d 303, 309 [2005]).
Courts and commentators have remarked on the unique status of DNA
evidence within the criminal justice system and in the minds of
jurors. "Modern DNA testing can provide powerful new evidence
unlike anything known before" (Dist. Attorney's Off. for Third
Jud. Dist. v Osborne, 557 US 52, 62, [2009]). The persuasiveness
of DNA evidence is so great that as one commentator noted,
"[w]hen DNA evidence is introduced against an accused at trial,
the prosecutor's case can take on an aura of invincibility"
(Robert Aronson & Jacqueline McMurtrie, The Use and Misuse of
High-Tech Evidence By Prosecutors: Ethical and Evidentiary
Issues, 76 Fordham L. Rev. 1453, 1469 [2007]).  Similarly, in a
three-case study, the researchers noted that "a mystical aura of
definitiveness often surrounds the value of DNA evidence to
exonerate the innocent and convict the guilty" (Joel D. Lieberman
et. al., Gold Versus Platinum: Do Jurors Recognize the
Superiority and Limitations of DNA Evidence Compared to Other
Types of Forensic Evidence?, 14 Psychol Pub Pol'y & L 27 [2008]).
Furthermore, this same aura "that surrounds DNA profiling has led
it to become 'perhaps the most powerful and thus the most

troubling forensic technology to ever be used in a court of law'" (id. at 33 [citation omitted]).  The studies suggested that "[g]iven the strength of DNA evidence in the face of strong cross-examination (and in the absence of any additional accompanying direct evidence), it appears that jurors may overvalue this high quality, but not flawless, evidence" (id. at 57).  The researchers concluded that "[t]he strong and largely invariant impact of DNA evidence across experimental conditions suggests that this type of scientific evidence maybe so persuasive that its mere introduction in a criminal case is sufficient to seriously impede defense challenges" (id. at 56).

Our dissenting colleague argues that defense counsel was effective and that we have wrongly concluded that a single failure to object constitutes ineffective assistance (dissenting op, at 1, 12).  That is incorrect and oversimplifies our analysis.  We do not base our decision on defense counsel's failure to object to an isolated, insignificant, albeit erroneous, statement by the prosecutor.  As our discussion makes clear, the prosecution's summation contains numerous misrepresentations of the evidence.  The apparent intent was to persuade the jury that the DNA established that defendant had committed the rape and murder, when the evidence did not, and could not, dispositively establish his guilt.  The record also makes clear that defense counsel failed to object throughout the summation, thus presenting multiple failures, different in kind

from that identified in People v Turner (5 NY3d 476 [2005]).
Given the prosecutorial misrepresentations that define the
summation in this case, we disagree with our dissenting colleague
that counsel's inactions are the equivalent of an excusable
"single error."

Furthermore, the appeal before us does not involve a
closing argument in which the prosecutor adhered to the trial
evidence and employed a certain rhetorical flourish, or merely
asked the jury to draw reasonable inferences from the evidence
presented at trial.  Nor are we presented with the more common
and understandable situation in which defense counsel was
reluctant to interrupt and bring undue attention to one slightly
off comment by the prosecution, and where the summation had
little or no impact on the defense.  Instead, defense counsel
here failed to object when the prosecution's statements exceeded
the "four corners of the evidence" (Ashwal, 39 NY2d at 109), and
affirmatively misrepresented the most critical evidence against
the defendant.[6]  Under these circumstances, defendant was
deprived of a fair trial.

---

[6]Our dissenting colleague's discussion of People v Fisher
(18 NY3d 964 [2012]) reveals that his disagreement with us is not
so much about whether defense counsel was ineffective for failing
to object based on some comparison to Fisher, but instead whether
the prosecutor actually misrepresented the evidence, and thus
committed prosecutorial misconduct under any standard (dissenting
op at 10-11).  Unlike the dissent, we believe the prosecutor
exceeded the bounds of acceptable commentary.  Once she crossed
that line, defense counsel should have acted.

Defendant's remaining contention that the evidence was legally insufficient is without merit.  Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

People of the State of New York v Howard S. Wright

No. 109

PIGOTT, J.(dissenting):

The majority holds that defendant was deprived of the effective assistance of counsel by looking at a single error in a vacuum, namely, alleged prosecutorial misconduct during summation to which defense counsel failed to object.  However, we have long held that "'[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met'" (People v Rivera, 71 NY2d 705, 708 [1988], quoting People v Baldi, 54 NY2d 137, 146-147 [1981] [emphasis supplied]).  I write separately because I believe that defense counsel's representation of defendant should be placed in its proper context and, viewed in its totality, defense counsel's representation in this instance was light years from what is deemed ineffective assistance under our jurisprudence.

I.

In this circumstantial case, defendant was convicted after a jury trial of one count of murder in the second degree (intentional murder), but was acquitted of murder in the second degree (felony murder) and rape in the first degree.  The

- 1 -

underlying facts, as proven at trial, were that the victim had last been seen in her car with defendant and another man, Christopher Gifford, in the early morning hours of November 29, 1995.  Later that morning, she was found dead with a black ligature tied around her hands and neck.  The defense conceded that defendant and the victim had engaged in sexual intercourse the morning she was found dead, and that both defendant and Gifford had been in the victim's car with the victim that morning.  The only issue at trial therefore was the identity of the person(s) who allegedly raped and murdered the victim.

In addressing that issue, the People presented at trial test results from, among other things, swabs taken from both the hand and neck ligatures and sperm samples taken from the victim's underwear and vagina.  Thus, we must assess defense counsel's competence in attacking the test results that tended to implicate defendant, i.e., the samples taken from the hand ligature.

To prove their case, the People relied on a type of DNA testing called Y-chromosome analysis, or "YSTR testing." According to the People's expert, Meghan Clement, Technical Director of the Forensic Testing Division at LabCorp, YSTR testing involves the analysis of male DNA when DNA samples consist of mixtures of both male and female DNA.  This form of testing ignores female DNA and focuses exclusively on the male DNA.  It allows the technician to distinguish how many males have contributed to a sample and whether the sample can be attributed

to a specific male.  When asked by the People to explain the process of YSTR testing, Clement testified as follows:

> "The first thing that occurs is we add chemicals to the sample to break open the cell to allow the DNA to be released. We will then quantitate to determine approximately how much Y chromosome DNA we are able to recover from a portion of a sample that we have used for testing.  We then genetically photocopy the specific areas on the Y chromosome where there are differences between males and run it through a detection system to visualize the characteristics present in a particular sample.  We use the same procedure for the unknown evidentiary sample as we do with a known reference sample and simply compare the fields of the two samples to determine if there are similarities or differences."

LabCorp created a chart from the samples subjected to the YSTR testing.  The chart contained, among other things, a column depicting the reference profile that had been obtained from the oral swab sample taken from defendant.  The chart also contained results that had been obtained from the swab samples taken from the hand ligature and the sperm samples taken from the victim's underwear and vagina.  Clement explained that, with regard to the hand ligature, she compared defendant's and the victim's husband's reference profiles to the characteristics obtained from the ligature sample and determined that both were possible contributors to mixture sample, i.e., she could not exclude them as contributors.  Clement explained that "[w]hat that means is that the characteristics seen within the mixture or characteristics possessed by that particular individual, and

because characteristics that they possess are found within that mixture, we cannot exclude them as being possible contributors."

Significantly, the proof at trial established that Clement excluded Gifford as a possible contributor to the hand ligature sample. With respect to the vaginal swab sample, however, Clement was unable to exclude defendant, Gifford or the victim's husband. However, defendant was excluded as the contributor to the sperm sample taken from the underwear, although Gifford was not.

Defense counsel ably attacked Clement's testimony, getting her to admit that a number of men may possess similar characteristics to defendant and that she had obtained reportable results for only four of the 12 areas tested on the hand ligature. Certain of those areas, she conceded, had shown evidence of degradation, i.e., that the sample had "broken down," so that she was able to obtain only what is known as a "partial profile." During cross-examination, Clement admitted that she obtained only "a limited amount of information" from the hand ligature samples; she also acknowledged that it was "possible" that there could have been more than two contributors to the hand ligature.

Significantly, defense counsel asked Clement if she had conducted any statistical calculations with regard to the YSTR testing, and she responded in the negative. She explained that she engaged in an "accounting method" for that type of testing,

but acknowledged that one could not "calculate statistics like we do with traditional, with nuclear or autosomal DNA testing" with YSTR. She further conceded that she could not give the jury a "statistical significance for the profile present in the [hand] ligature." Perhaps the most damaging testimony that defense counsel elicited from Clement was that she could not state with a reasonable degree of scientific certainty that defendant's DNA was on the hand ligature sample that she had tested.

Defense counsel was simply unrelenting at trial attacking not only YSTR analysis as a science, but also what the results ultimately showed. His attacks did not cease at the conclusion of the People's case-in-chief, either. During his summation, he hammered away at Clement's concessions that she could not state with a reasonable degree of scientific certainty that the DNA on the hand ligature was defendant's and that she could not provide any statistical analysis concerning the YSTR results.

## II.

The critical error that defense counsel made, according to the majority and defendant, is that he did not object to certain statements that the prosecutor made during summation. To be sure, the prosecutor stated that defendant and Gifford "left their DNA all over the crime." Viewing that statement in a vacuum, as the majority does, one could not draw any conclusion other than that defense counsel should have been on his feet,

pounding the table and objecting to that statement.  Viewed in

context, however, that statement does little more than serve as

an introduction to the prosecutor's discussion of the DNA

evidence.  What was contained in her discussion?  Statements that

one "cannot put a statistical calculation on" YSTR DNA, and that

the sperm fraction of the vaginal swab "matched the YSTR DNA

profile" of defendant and Gifford.  The majority takes issue with

the prosecutor's use of the word "matched," but when she utilized

that word, it was to argue that the sample "matched" defendant's

YSTR DNA profile.

The majority claims that "the prosecutor aggressively

advanced the view that defendant's DNA conclusively matched that

found at the crime scene and on the victim" (majority op, at 18),

but that is simply not the case.  The People did not misrepresent

the evidence as the majority claims, but, rather, repeatedly

argued that defendant's YSTR DNA profile matched the DNA taken

from the ligature:

> "Probably the most or the piece of evidence
> that we, [defense counsel] and I, disagree on
> the most would be the DNA taken from the hand
> ligature that was binding [the victim's]
> hands behind her back. . . . That ligature
> was wrapped and tied tight around her wrist.
> And what do we know about that?  Were we able
> to get a complete profile?  No.  But at four
> locations there was able to be detected the
> presence of a Y chromosome, and this is
> something that you can go back and study,
> too.  As you've heard during the testimony of
> LabCorp, each number represents an allele or
> a number assigned to that individual's DNA at
> that particular Y location.  The ligature on
> the hands, every single number that they were

able to determine, and they were able to detect <u>partial profile matches</u>, is that of [defendant] and [the victim's husband]. She told you, because this is a <u>partial profile and because the DNA on the ligature is a mixture, they are not able to give you a statistical calculation</u>, but she can tell you, according to her expertise, that [defendant] could not be excluded as a contributor to the mixture on that ligature.

"Now, I want you to also look at the chart. Of the people that were with her that night, we have Christopher Gifford's <u>YSTR profile</u>, Keith Milburn Evans' <u>profile</u>, we have the Walker brothers' <u>profile</u>. Remember, Christopher and Frederick Walker would have the same YSTR <u>profile</u> because they are brothers, and [defendant], we have got the <u>YSTR profile</u>, even throwing [the victim's husband] in, they all have different <u>profiles</u>, all have different alleles at the locations. The only one that matches of the people that she was with that night, the only one who <u>matches the DNA profile</u> on the ligature is [defendant]. Is that coincidence? I don't think it is. Could it be transference? I don't think it is. Could there be a reasonable explanation? I don't think there is, and I don't think I am asking you to take a leap of faith or assume facts upon facts upon facts. <u>You need to look at the ligature DNA profile in light of all the other evidence that you have</u>. Could there be a reasonable explanation for one thing? Sure. Could there be a reasonable explanation for two things? Sure. But what we have here, we have no reasonable explanation for [defendant's] DNA on that ligature that bound her hands.

"In light of all the other evidence, we have [defendant] and his codefendant with her hours before her body was discovered. [The victim's husband] wasn't there. We had [defendant] and Christopher Gifford together alone hours later. We have them alone in her car before her body is discovered. We have [defendant] showing [the victim's] car to Keith Evans. We have [defendant's] sperm on

[the victim's] underwear, and we have [defendant's] DNA profile included on the ligature that bound her hands together, the same identical ligature that is around her neck and strangled her to death.  When you look at all of that, there is no reasonable explanation other than the fact that he and Christopher Gifford took her in that car, tied her up, raped her, strangled her, dumped her on Skuse Street, and got on with their own business.

"This is a case of common sense and science. [The victim] didn't deserve to die that way. She was a drug addict.  She got herself into a bad situation, but it doesn't escape the facts.  The defendant's DNA is inside her, on her underwear, on the ligature that binds her hands.  He is seen with her while she is alive before her body is discovered.  He is seen with Christopher Gifford afterwards driving around in her car, and he points out her car to another friend, bragging about it being parked on Burbank Street.  When you put it all together, members of the jury, it is common sense and there is only one conclusion you can reach and that is guilty.  Thank you" (emphasis supplied).

It is irrelevant that the prosecutor referred to defendant's DNA being inside the victim or on her underwear; the defense conceded during opening statements that defendant had been with the victim and had engaged intercourse with her, so there was no point in defense counsel objecting to that part of the prosecutor's statement.  Moreover, defense counsel, proving his effectiveness, actually got defendant acquitted of the first degree rape and felony murder counts.  The jury plainly rejected the People's theory that defendant raped the victim.  When the rape charge fell, so too did the felony murder charge upon which the rape charge was premised.

The People carefully explained to the jury that they were not able to obtain a complete profile or a statistical calculation.  Essentially, the People's summation acknowledges that they believed that their YSTR DNA evidence was relatively weak, which explains why the prosecutor told the jury that "[t]his is a case of common sense and science."  The prosecutor did not represent the YSTR DNA evidence as a "slam dunk," but, rather, asked the jury to "put it together" and "to look at the ligature DNA profile in light of all the other evidence that you have" (emphasis supplied).  Indeed, the People had more than just the YSTR DNA results tying defendant to the crime.  They also had the testimony of two eyewitnesses who saw defendant and his accomplice with the victim hours before she died, and testimony from one of those witnesses that defendant had taken him to where the victim's car was parked just one day after the victim was found dead.  The YSTR DNA profile evidence was just one piece of the puzzle.  The prosecutor knew that.  Defense counsel knew that.  And the jury knew that, too, based on both the proof presented at trial and defense counsel's effective cross examination of Clement.

This is not a case where the People misrepresented the DNA evidence as being more important and powerful than it actually was.  The People did not pursue a theory that this type of DNA evidence statistically identified defendant as the perpetrator.  Indeed, the prosecutor was careful to explain the

limitations of the YSTR DNA evidence that was presented.
Essentially, what the majority does is take two throwaway lines
by the prosecutor, one made at the beginning of the discussion of
the DNA evidence and one at the end, and ignores the prosecutor's
thorough explanation of the evidence that is sandwiched in
between the two.  There is a reason why defense counsel did not
object:  when the two damaging statements are viewed in the
context of the prosecutor's overall summation, there was simply
no need for him to register an objection.  His silence in that
regard did not somehow "negate" his competent representation up
until that point.

The alleged ineffectiveness in this case is
significantly weaker than counsel's ineffectiveness in People v
Fisher (18 NY3d 964 [2012]).  In that case, which involved child
molestation allegations against the defendant, "the prosecutor
improperly encouraged inferences of guilt based on facts not in
evidence" by arguing during summation that the two alleged child
victims had "'said the exact same thing over and over again'" to
police, social workers and others when there was no evidence to
that effect, thereby bolstering their testimony (id. at 966).
The prosecutor also asked the jury to infer that the childrens'
acting out at school supported the abuse allegations (see id.).
Further, the prosecutor minimized her influence over the benefit
that was to be bestowed upon the jailhouse snitch who testified
that the defendant had made incriminating statements while

incarcerated (see id. at 967).  And, during summation, the prosecutor pleaded to the jury that "'[t]he voice of a child is evidence, the testimony of the two children is evidence.  The day that the voice of child is not evidence is the day that those doors [the doors to the courtroom] should be locked forever'" (id.).  Defense counsel did not object to any of these improprieties, and we held that his failure to do so deprived the defendant of his right to the effective assistance of counsel (see id.).

Unlike the situation in Fisher, where errors occurred not just during the People's case-in-chief but also during summation, the majority's real problem with defense counsel's representation in this case is his failure to object to the prosecutor's statements during summation.  But, as evidenced from the overall context of that summation, there was no misrepresentation of the DNA evidence at all.  To claim otherwise is a disservice to defense counsel, who ably cross examined Clement, obtained damaging concessions from her, and persuaded the jury to acquit defendant on two of the three counts in the indictment.  A cursory review of the prosecutor's summation statements does not paint a picture of a rogue prosecutor attempting to mislead the jury by misrepresenting the evidence presented, nor does it paint a picture of a defense counsel sitting idly by while the prosecutor spins a deceitful web.

The majority concedes that, up until the prosecutor's

summation, defense counsel had undertaken "a rather effective defense strategy of identifying the weaknesses of the DNA evidence" (majority op, at 21-22). By this, what it really means is that this is one of those "rare" cases where "a single failing in an otherwise competent performance is so 'egregious and prejudicial' as to deprive [this] defendant of his constitutional right" (People v Turner, 5 NY3d 476, 480 [2005], quoting People v Caban, 5 NY3d 143, 152 [2005]; Murray v Carrier, 477 US 478, 496 [1986]).

The majority claims that defense counsel's failure to object to the prosecutor's alleged objectionable statements evidenced "multiple failures, different in kind from that identified in Turner" (majority op, at 23-24), but simply calling something "multiple failures" does not make it so. The one mistake defense counsel allegedly made, and the one mistake cited by the majority as a basis for its reversal, is that defense counsel failed to object to the prosecutor's alleged mischaracterization of the evidence. Indeed, even the Appellate Division dissenters deemed defense counsel's alleged failure to object to be a "single error" that "was so egregious and prejudicial that defendant did not receive a fair trial" (115 AD3d 1257, 1262 [4th Dept 2014]). If the majority wishes to extend Turner to an alleged single mistake made by counsel during summation, it should expressly do so rather than utilizing phrases like "serial failure to object" (majority op, at 15) and

"multiple failures" (majority op, at 23) in order to justify the result it reaches in this appeal.

Viewing defense counsel's representation in its totality, as we must, it is evident that defendant was afforded his constitutional right to effective assistance of counsel, and I would therefore affirm the order of the Appellate Division.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed and a new trial ordered.  Opinion by Judge Rivera.
Chief Judge Lippman and Judges Read, Abdus-Salaam and Stein
concur.  Judge Pigott dissents in an opinion.  Judge Fahey took
no part.

Decided July 1, 2015